[No. 11886-0-III.   Division Three.   June 24, 1993.]

ALAN BASSANI, ET AL, *Appellants,* v. BOARD OF COUNTY
COMMISSIONERS FOR YAKIMA COUNTY,
ET AL, *Respondents.*

*Robert M. Boggs* and *Lyon, Beaulaurier, Weigand, Suko & Gustafson,* for appellants.

*Jeffrey C. Sullivan, Prosecuting Attorney,* and *Terry Austin, Deputy; Charles C. Flower* and *Flower & Andreotti,* for respondents.

SHIELDS, C.J. — Alan and Mary Jo Bassani appeal a superior court order which affirmed the Yakima County Board of County Commissioners' (Board) approval of an application to rezone 32 acres of land from general rural (GR) to light industrial (LI). The Bassanis contend there was insufficient evidence of changed circumstances to support a rezone, and it was an illegal spot zone. We affirm.

The property at issue, 32 acres owned by Norman and Mary Richardson, lies on the south side of Gun Club Road in the East Valley area of Yakima County. Gun Club Road is the southern border of the Yakima City Urban Area; lands to the north are within the urban area, lands to the south are not. The Richardsons own a trucking business, Easley Hauling Service, Inc., which currently uses the west 14 acres of the site to park and service truck trailers. The east 18 acres

are nonirrigated pasture with no improvements. The rezone changes Easley's use of the west 14 acres from a legal nonconforming use in a GR zone to a conforming use in an LI zone. The rezone also permits Easley to expand its now conforming use onto the adjacent 18 acres lying to the east.

The relevant history of the land begins in 1969 when the Richardsons bought the west 14 acres of the site. At first, Easley used approximately 6.4 acres of this plot. Easley originally employed 10 people. At the time, Yakima County did not have a comprehensive zoning ordinance.

In 1974, Yakima County adopted its first comprehensive zoning ordinance and zoned the 14-acre plot as "agricultural". Easley's use thus became a legal nonconforming use of the land.

In 1982, zoning amendments implemented the Yakima County Rural Land Use Plan and legislatively rezoned the plot to GR. Easley's use of the land continued as a legal nonconforming use.

In 1984, the county zoning adjuster authorized Easley to expand its use of the land by enlarging a shop and office building on the 6.4 acres it had been using. Mr. Bassani appealed this ruling, but withdrew his appeal pursuant to a settlement agreement in exchange for Easley's promise not to use one of the two major routes onto its property.

In 1985, the Yakima County Board of Adjustment authorized an expansion of the nonconforming use onto the balance of the 14-acre plot.

In 1987, the Richardsons bought the remaining 18 acres of the site, a plot which adjoined the 14-acre plot on the east. Then, they applied to have both plots rezoned to LI. By 1987, Easley had 65 employees on site, 50 trucks and 75 trailers based there, and was operating 24 hours a day, 7 days a week, averaging 125 truck trips to and from the site daily. The Yakima County Planning Commission held one hearing on the application in 1987. Then the Richardsons requested an indefinite continuance while they applied to extend the Yakima City Urban Area boundary to include their property.

In 1988, the regional planning commission considered seven scenarios for extending the urban area boundary. In the end, it decided not to extend the urban area boundary.

In 1990, the Richardsons renewed their rezone application. The Yakima County Planning Commission held a public hearing on the application on March 28, 1990. The planning commission recommended approval of the rezone, subject to road improvements and dedication of a right of way, and made written findings of fact and conclusions. The planning commission found changed circumstances had occurred, due to light industrial and economic growth in the area.

On May 15, 1990, the Board held a public hearing to consider the planning commission's recommendation. The Board heard testimony, accepted evidence, and considered the record before the planning commission. It adopted the planning commission's recommendation without change. Thus, the Board rezoned the property from GR to LI.

The Bassanis sought judicial review pursuant to a writ of certiorari. The Superior Court reviewed the administrative record and sustained the rezone. The Bassanis now appeal.

The Bassanis first contend the planning commission's finding of changed circumstances was not supported by substantial evidence. Asserting that Washington law is silent on the level of change deemed substantial, they invite this court to follow other states' laws in requiring "strong" evidence of change and in disregarding changes occurring on the subject property itself. Their invitation overlooks the well-settled law of this state.

■ Review of a rezone decision on writ of certiorari is governed by RCW 7.16.120, which provides:

> The questions involving the merits to be determined by the court upon the hearing are:
>
> . . . .
>
> (4) Whether there was any competent proof of all the facts necessary to be proved, in order to authorize the making of the determination.

(5) Whether the factual determinations were supported by substantial evidence.

*Parkridge v. Seattle*, 89 Wn.2d 454, 459, 573 P.2d 359 (1978). In reviewing an order on writ of certiorari, the appellate court reviews the administrative record and does not rely on the superior court's findings or conclusions. *Balser Invs., Inc. v. Snohomish Cy.*, 59 Wn. App. 29, 36, 795 P.2d 753 (1990).

■ Generally, a local legislative body's decision to rezone specific tracts of land under a zoning code is an adjudicatory, quasi-judicial act. *Barrie v. Kitsap Cy.*, 93 Wn.2d 843, 852, 613 P.2d 1148 (1980); *Woodcrest Invs. Corp. v. Skagit Cy.*, 39 Wn. App. 622, 694 P.2d 705 (1985). As such, a rezone decision does not enjoy a presumption of validity. *Parkridge*, at 462; *Woodcrest*, at 627. However, the rezone decision is granted some deference on review. *Save a Neighborhood Env't v. Seattle*, 101 Wn.2d 280, 285, 676 P.2d 1006 (1984) (*SANE*); *Woodcrest*, at 627. It is the appealing party's burden to show that the rezone was erroneous. *Englund v. King Cy.*, 67 Wn. App. 701, 705, 839 P.2d 339 (1992).

■ Because of this limited deference, a rezone decision will only be overturned if it is arbitrary, capricious, or contrary to law. *Mall, Inc. v. Seattle*, 108 Wn.2d 369, 374, 739 P.2d 668 (1987); *Balser*, at 36. *See Murden Cove Preserv. Ass'n v. Kitsap Cy.*, 41 Wn. App. 515, 519, 704 P.2d 1242 (1985). A decision is arbitrary and capricious if it is

> willful and unreasonable action, without consideration and [in] disregard of facts or circumstances. Where there is room for two opinions, action is not arbitrary and capricious when exercised honestly and upon due consideration though it may be felt that a different conclusion might have been reached.

*Barrie*, at 850 (quoting *Buell v. Bremerton*, 80 Wn.2d 518, 526, 495 P.2d 1358 (1972)). *See State v. Ford*, 110 Wn.2d 827, 830-31, 755 P.2d 806 (1988); *Balser*, at 37. Therefore, the inquiry on appeal is whether the Board's ruling was willful, unreasonable, and without consideration of facts and cir-

cumstances. This inquiry depends on what facts the Board was required to consider at the rezoning hearings.

■ The proponent of the rezone has the burden of showing that conditions have substantially changed since the original zoning or latest amendment. *Parkridge,* at 462; *Woodcrest,* at 627. The proponent must also show that the rezone bears a substantial relationship to the public health, safety, morals, or general welfare. *Parkridge,* at 462. Only the showing of substantial change is at issue in this appeal.

■ Washington requires a showing that conditions have "substantially changed"; it does not require a "strong" showing of change. *Parkridge,* at 462; *Woodcrest,* at 627. This rule is flexible and allows for consideration of each case on its own facts. *Buell,* at 526. *See SANE,* at 286; *Hayden v. Port Townsend,* 93 Wn.2d 870, 878-79, 613 P.2d 1164 (1980), *overruled on other grounds in SANE; Murden Cove,* at 520-23. The lawful growth of a business, through "approved commercial uses on the subject property . . .", may form part of the evidence showing that circumstances have substantially changed. *Murden Cove,* at 522.

By these standards, the Board's decision was not arbitrary and capricious. It was supported by evidence that circumstances had substantially changed since 1982. The evidence in the record demonstrates substantial change in two categories: on the subject property and in the general area.

On the subject property itself, Easley's business operations had grown from 40 to 50 trips per day in 1985 to 125 trips per day in 1987. The number of employees at the site had grown from 10 in 1969 to 65 in 1987. In 1984, Easley's use of the property expanded when the county zoning adjuster authorized enlargement of a shop and office building. In 1985, Easley's use of the property again changed significantly when the county board of adjustment approved Easley's application to expand its use of the land onto the entire 14-acre lot. The Bassanis concede the factual nature of this evidence.

There is also evidence that circumstances in the general area had substantially changed since 1982, when the general area had been primarily zoned agricultural, rural, and

residential. The Yakima City Council created a light industrial zone (M-1) pursuant to the urban area zoning ordinance passed on March 4, 1986. Yakima Municipal Code §§ 15.01.010, 15.03.030(12) (1992). This light industrial zone is within one-fourth mile of, and more than twice as large as, the Easley property. Since 1976, traffic flows generally increased from 30 percent to 158 percent on neighboring roads; only 6 percent of this traffic was truck traffic. The comprehensive plan itself, at page 36, acknowledges "[i]t is in these areas [on the borders of incorporated communities] that the strongest growth pressures exist . . .". The Easley property lies on the fringe of an incorporated community; it is across the street from the Yakima city limits.

Evidence presented at the public hearings also provided substantial evidence the general area was undergoing rapid growth. Harold Ferguson submitted a letter reading in pertinent part, "[w]e hope the planning commission will re-examine alternatives with the best interest of all being served[,] as our area is growing rapidly . . .". A citizen identified only as Alex testified before the Board as follows:

> Mr. Chairman, I guess nobody knows this property better than I do. I think that we're constantly undergoing change in that area at least in my mind will [*sic*] not see any housing projects being developed in that area and I think that the rezone application is certainly in order in view of the makeup of that area . . ..

Finally, the Bassanis themselves caused a substantially changed circumstance in 1984: they negotiated an agreement that they would cease prosecuting a lawsuit against Easley in consideration for Easley's agreement to stop using one of the two main routes onto its property.

The administrative record contains substantial and competent evidence showing that circumstances had substantially changed since the last zoning amendment in 1982.[1]

---

[1]Although Mr. Richardson claims that the City of Moxee was in the process of rezoning 350 acres of property within approximately one-half mile of the Easley property to light industrial use, there is no testimony before the Board to that effect. Moreover, testimony that the federal government had recently decided to re-study the boundaries of the Yakima River 100-year floodplain is not substantial evidence, because there is no evidence as to what the results of that study were.

The Board's ruling was not willful or unreasonable, and it was based on due consideration of the facts and circumstances of the case. While there may be room for two opinions on the matter, the action was exercised honestly, upon due consideration, and was not arbitrary, capricious, or contrary to law. Competent and substantial evidence supports the rezone.

The Bassanis next contend the rezone was an illegal spot zone in violation of *Smith v. Skagit Cy.*, 75 Wn.2d 715, 743, 453 P.2d 832 (1969).

Our courts have frequently held that a county's rezone will be overturned "[o]nly where the spot zone grants a discriminatory benefit to one or a group of owners to the detriment of their neighbors or the community at large without adequate public advantage or justification . . .". *SANE*, at 286 (quoting *Save Our Rural Env't v. Snohomish Cy.*, 99 Wn.2d 363, 368, 662 P.2d 816 (1983) (*SORE*)); *Murden Cove*, at 520. *See Smith*, at 743.

■ The well-recognized test for illegal spot zoning has been set forth as follows:

> Spot zoning is zoning action by which a smaller area is singled out of a larger area or district and specially zoned for a use classification totally different from, and inconsistent with, the classification of surrounding land and not in accordance with the comprehensive plan.

*SANE*, at 286; *Murden Cove*, at 520. *See SORE*, at 368; *Smith*, at 743.

A comprehensive plan is only a general blueprint; it generally proposes rather than disposes. *Buell*, at 526. Deviation from a comprehensive plan does not necessarily render a rezone illegal; only general conformance is required. *Cathcart-Maltby-Clearview Comm'ty Coun. v. Snohomish Cy.*, 96 Wn.2d 201, 212, 634 P.2d 853 (1981). Moreover,

> [d]eviation from a comprehensive plan by increasing the area in which particular use is permitted is not automatically spot zoning. Each case must be decided on its own facts.

*Buell*, at 526.

The rezone in this case was permissible: it simply allowed Easley to expand the area in which it parks its trailers, a use which has been legally permitted for more than 20 years.

Moreover, the rezone complied generally with the comprehensive plan. The rural land use plan (rural plan) and the comprehensive plan in this case must be read together, for the rural plan was expressly written to be a supplement to the comprehensive plan, and in the case of conflicts between the two, the rural plan was intended to prevail. The rural plan generally functions as a plan for conserving productive agricultural lands; nonproductive lands fall outside its primary goal:

> [T]he prevailing attitude is that protective agricultural zoning should only be applied to productive agricultural lands. Marginal agricultural areas, nonproductive lands or areas experiencing development pressure should be considered for some other type of zoning.

Rural plan, at 6.

The Richardsons' land is nonproductive agricultural land; it is too rocky and boggy. It is also, as noted above, experiencing substantial growth pressure. Thus, a rezone is consistent with the rural plan. The rural plan purports to modify only three of the comprehensive plan's rural land use categories, and it does not mention, by inclusion or exclusion, LI zones. Hence, the comprehensive plan's guidelines on LI zoning are controlling.

The comprehensive plan states that one of its purposes is to provide areas for industrial development adjacent to cities and compatible with quality residential housing. The criteria for LI zoning, as specified in the comprehensive plan, are: (1) soil suitable for moderate development; (2) absence of agriculturally productive soils; (3) contiguous to a city or town; (4) already developed for industrial purposes; and (5) present residents and property owners express a preference for such development.

Far from being incompatible with these criteria, the Richardson property meets them all. The planning commission's

staff report found that the area is suitable for light industrial development, the soil is not agriculturally productive, the property is contiguous to the city of Yakima, 14 of the 32 acres are already used for Easley's light industrial purposes, and the record indicates the majority of residents — some 17 or so — testified in favor of the rezone. Only Mr. Bassani, his lawyer, and one other person testified against the rezone.

Finally, the comprehensive plan acknowledges that "Yakima County's agricultural economic base is largely dependent upon an efficient trucking industry for vital transportation requirements." The undisputed testimony from the record indicates Easley's main business is hauling the products of the farms, processing plants, and packing plants in the Yakima area. Thus, the rezone bears a substantial relationship to the welfare of the community. *SANE*, at 286; *Murden Cove*, at 520. *See SORE*, at 368; *Smith*, at 743-44. The main reason for the rezone, reiterated throughout the public hearings, was that it was good for the County, and good for one of the County's major employers. Because the rezone is generally consistent with both the comprehensive and rural plans, it was not illegal spot zoning.

We affirm.

MUNSON and SWEENEY, JJ., concur.

Review denied at 122 Wn.2d 1027 (1993).