[No. 59545-3. En Banc. October 28, 1993.]

KLICKITAT COUNTY CITIZENS AGAINST IMPORTED WASTE, ET AL, *Appellants*, v. KLICKITAT COUNTY, ET AL, *Respondents*.

620

622

*Timothy Weaver* (of *Cockrill & Weaver, P.S.*), for appellants.

*Gerald A. Matosich, Prosecuting Attorney,* and *P. Stephen DiJulio* and *J. Tayloe Washburn* (of *Foster Pepper & Shefelman*), *Special Deputies,* for respondent County.

*Preston Thorgrimson Shidler Gates & Ellis,* by *Thomas H. Wolfendale* and *Thomas Eli Backer,* for respondent Regional Disposal Co.

JOHNSON, J. — This case presents the issue of the legality of Klickitat County's 1990 Solid Waste Management Plan Update (1990 Plan Update) and its accompanying environmental impact statement (EIS). The 1990 Plan Update and EIS were prepared after the Yakima Indian Nation successfully challenged Klickitat County's previous 1989 Solid Waste Management Plan Update (1989 Plan Update), which the Superior Court held was void for failure to prepare an EIS. In this case, the Yakima Indian Nation challenges the adequacy of the 1990 Plan Update and EIS prepared in response to that court order, arguing the 1990 Plan Update and EIS fail to comply with the order or with the requirements of the State Environmental Policy Act of 1971 (SEPA), RCW 43.21C. Skamania County Superior Court upheld the 1990 Plan Update and EIS as adequate. We affirm.

# I
## FACTUAL BACKGROUND[1]

The facts of this litigation are extensive and divide into two parts: facts leading up to the initial litigation over the 1989 Plan Update and facts of the 1990 Plan Update litigation. Because both sets of facts are critical to deciding the issues before this court, they are outlined below.

## A
### The 1989 Plan Update

In 1973, Klickitat County (County) first adopted its Solid Waste Management Plan (Plan) pursuant to RCW 70.95. Following revisions to the Plan in 1977 and 1986, the County established a Solid Waste Advisory Committee (SWA Committee) to assist in revising the Plan in response to changing state and federal law, including the 1986 Columbia River Gorge National Scenic Area Act. Because the County's Horsethief Landfill was located within the Gorge's scenic area boundary, that landfill would have to be closed by 1990, and a new landfill relocated outside that boundary. In 1987, the SWA Committee began the process of updating the Plan. This process would eventually produce the 1989 Plan Update.

In February 1988, the SWA Committee voted to advise the Klickitat County Board of Commissioners (Board) to take various actions regarding waste disposal. In particular, the SWA Committee recommended the County enter into a contract with a private company to construct and operate a County-owned regional landfill. These recommendations were incorporated into the first draft of the 1989 Plan Update.

On June 20, 1988, the Board held a public hearing on the 1989 Plan Update. As a result of comments received at that

---

[1]Our citations to the administrative record follow the format used by the parties, dictated by the method by which the record was compiled. Exhibits which were before the trial court are contained in a 4-volume administrative record entitled "return on writ" and "supplemental return on writ" (ROW). Documents such as the 1990 Plan Update are included in the ROW, but are bound separately. As such, these documents will be cited by their specific name, volume, and page number, if applicable.

hearing, the County began considering the feasibility of contracting for private development of a large regional landfill in the County. Three contractors submitted proposals, including Rabanco Regional Landfill Company (Rabanco).[2] On March 16, 1989, the County selected Rabanco as "first vendor" and began negotiating a contract. Following public hearings, the County entered into an "Agreement Concerning Solid Waste Handling" with Rabanco. Klickitat County Resolution 07489.

Rabanco started the process for full environmental review on the development of various solid waste management projects, including the building of a regional landfill near Roosevelt, Washington (Project or Roosevelt Landfill). A final environmental impact statement on the Roosevelt Landfill was issued on December 18, 1989. A conditional use permit was issued in January 1990, and Rabanco began constructing the multimillion dollar regional Roosevelt Landfill.[3]

While the County was negotiating the contract with Rabanco, the County was also in the process of completing the 1989 Plan Update. On May 4, 1989, the Board formally adopted the 1989 Plan Update. Resolution 06489. Its recommended course of action for waste disposal was the building of the new regional Roosevelt Landfill by Rabanco. The 1989 Plan Update authorized the Roosevelt Landfill to accept up to 1 million tons per year of mixed municipal solid waste.

The 1989 Plan Update was accompanied by an environmental checklist and a Determination of Nonsignificance (DNS) for purposes of compliance with SEPA. Under the DNS, the County determined that nothing in the 1989 Plan Update would significantly affect the quality of the environment and an EIS would not be required. *See* RCW 43.21C-.030(2)(c). Under SEPA, only projects which may have a prob-

---

[2]Rabanco Regional Landfill Company is now known as Regional Disposal Company.

[3]Although the Yakima Indian Nation challenged the conditional use permit and the project level landfill EIS, its challenge was dismissed on procedural grounds. That dismissal was not appealed.

able significant, adverse environmental impact require the preparation of an environmental impact statement. RCW 43.21C.031. As a result of this threshold determination, the County did not prepare an EIS on the 1989 Plan Update.

A citizens' group, Klickitat County Citizens Against Imported Waste (Citizens), challenged the DNS and the 1989 Plan Update in Skamania County Superior Court. The Yakima Indian Nation was granted intervenor status. The matter was tried in May 1990 before Judge Robert L. Harris, visiting judge from Clark County. On July 13, 1990, Judge Harris entered the first of several memorandums of opinion, setting aside the DNS and requiring further environmental studies before any action based upon the solid waste plan could be undertaken. The court stated:

> It is clear that this project was on a fast track and that attempt was made to minimize the environmentally significant decisions. This effort to segregate the planning activities to escape the triggering mechanism, which is the very purpose of environmental law, did not ensure that the lead agency and the responsible officials had adequate understanding prior to being taken so far down the road that their decision is irreversible.
>
> . . . .
>
> The purpose of the Declaration of Nonsignificance is not merely to [pay] lip service to the environment in going through the planning process, but to make a meaningful analytic decision based upon all available information that can be gathered, from all existing agencies, that may be affected prior to any action.

Clerk's Papers, at 5-7.

On September 11, 1990, the court issued another memorandum of opinion, and on September 14, the court issued its findings of fact, judgment, and order. The court held: (1) the County's decision to issue a DNS was clearly erroneous; (2) the County's 1989 Plan Update was void for having been developed without adequate environmental study; (3) all permits issued as a result lacked validity; (4) the Roosevelt Landfill could be used for deposit of waste only at the 1977 Plan level and disposal activity inconsistent with that Plan would not be permitted until the County adopted a final EIS and plan update providing for such activity; and (5) the

portion of the contract between the County and Rabanco relating to deposit of solid waste other than that consistent with the 1977 Plan was enjoined. Clerk's Papers, at 10-13; 1990 Plan Update vol. 1 app. F. The County appealed this holding. The appeal was dismissed as moot, however, because the County was already in the process of preparing the 1990 Plan Update and related EIS. Thus, the validity of the 1989 Plan Update or the DNS is not at issue in this case.

B
The 1990 Plan Update

Prior to the trial on the 1989 Plan Update, the County agreed with the State Department of Ecology to accelerate its next update process to accommodate recent changes in state law under the solid waste management act, Laws of 1989, ch. 431. In particular, the new update needed to address in more detail the disposal of waste from construction, demolition, and land clearing (CDL/woodwaste), and the building of a facility to handle this waste. In May 1990, the SWA Committee began the process of reviewing and updating the 1989 Plan. In July 1990, Judge Harris entered the memorandum of opinion, outlined above, setting aside the 1989 Plan Update and DNS, and ordering further environmental studies on the decision to adopt a regional waste landfill. Following entry of the July opinion, but before entry of the September opinion and judgment, the County began preparing an EIS for the 1990 Plan Update.

The County formally began the EIS process on August 1, 1990, by issuing a Determination of Significance (DS) and Request for Comments on Scope of EIS. A DS is the formal threshold determination under SEPA, indicating a proposed action will have a probable significant adverse impact on the quality of the environment, thereby triggering the need for an EIS. WAC 197-11-360. The DS notice and request for comments was mailed to interested persons and entities. The deadline for comments by any agency, tribe, or the public on the scope of the EIS was set for August 9, 1990. The DS also gave notice of a public scoping meeting, also set for

August 9. At the request of the Yakima Indian Nation, the deadline for comments was extended to August 17, 1990, and a second scoping meeting was conducted on that date.

Fourteen days after the end of scoping, the County issued a draft 1990 Plan Update and draft EIS on August 31, 1990. The draft EIS examined the County's solid waste policy options, including the preferred plan of the Roosevelt Landfill, and the environmental impact and mitigation measures of various alternatives as well.

The 1990 Plan Update specifically addressed the disposal of CDL/woodwaste. The 1990 Plan Update proposed increasing waste disposal over the 1989 Plan Update from 1 million to 3 million tons per year in order to accommodate CDL/woodwaste. Although the 1990 Plan Update draft EIS contained some analysis of the environmental impact of CDL/woodwaste disposal, the draft EIS also incorporated by reference several other environmental documents to fully cover its analysis of CDL/woodwaste impact. It incorporated the final EIS for the Rabanco Roosevelt Landfill Project, which had already been built, and Rabanco's draft supplemental EIS proposing the building of a new CDL/woodwaste facility next to the existing Roosevelt Landfill (CDL/woodwaste DSEIS). Although the 1990 Plan Update and draft EIS were issued on August 31, the incorporated CDL/woodwaste DSEIS was not issued and made public until September 4, 1990.

The County originally planned to combine the 1990 Plan Update EIS with the site-specific CDL/woodwaste DSEIS. However, the Yakima Indian Nation objected to the inclusion of the CDL/woodwaste DSEIS in the 1990 Plan Update draft EIS on the grounds a valid solid waste management plan must be in place before proceeding with developing a site-specific proposal based on that plan. The County then withdrew the CDL/woodwaste DSEIS and agreed to wait until after the Board acted on the 1990 Plan Update to issue the final CDL/woodwaste SEIS. Although the CDL/woodwaste DSEIS was withdrawn, the final version of the 1990 Plan

Update and EIS continued to incorporate the CDL/wood-waste DSEIS by reference in its entirety.

Once the draft 1990 Plan Update and EIS were issued, the 30-day comment period required by SEPA commenced. WAC 197-11-502(5)(b). The Yakima Indian Nation submitted several letters pertaining to the impact of the 1990 Plan Update on historical and cultural resources. Its comments along with a response by the County were published in the final EIS. The County granted all requests for extension of the comment period. In response to a request from the Yakima Indian Nation, a separate public hearing was held on September 24, 1990, on the draft 1990 Plan Update. Several open meetings of the SWA Committee were held to review the draft 1990 Plan Update. The final EIS was issued on November 29, 1990, 59 days after closure of the published comment period. SEPA requires the final EIS to be issued within 60 days of the end of the comment period. WAC 197-11-460(6). The 1990 Plan Update and EIS were combined into one document, as allowed by SEPA rules. *See* WAC 197-11-640.

On December 17, 1990, the Board conducted a public hearing and formally adopted the 1990 Plan Update and EIS. Resolution 17090. The Plan was then submitted to the Department of Ecology, which subsequently gave its approval.

The Yakima Indian Nation filed an administrative appeal of the County's decision to adopt the 1990 Plan Update and EIS on the grounds the EIS was inadequate. The Board conducted a hearing and, in a 2-to-1 decision, determined the EIS was adequate.

While the trial court had maintained jurisdiction of the original writ of certiorari brought in 1989, in January 1991 the Yakima Indian Nation filed a petition for writ of certiorari and review in Skamania County Superior Court. This petition was heard in May 1991 by Judge Harris as part of the 1989 challenge. The court held the EIS was adequate and affirmed the Board's approval of the 1990 Plan Update. The court lifted its injunction from the previous trial, and

Rabanco proceeded to expand the Roosevelt Landfill. Following denial of a motion for reconsideration, the Yakima Indian Nation appealed, and this court accepted direct review.

## II
### ISSUES

A. Should the appeal be dismissed as moot?

B. Should the CDL/woodwaste draft supplemental EIS have been incorporated by reference into the 1990 Plan Update when it was not an "existing" environmental document at the time of original incorporation, was later withdrawn from circulation, and was a site-specific document being incorporated into a nonproject plan document?

C. Did the EIS for the 1990 Plan Update comply with SEPA by adequately addressing the impact of developing a large regional landfill on the cultural and historical environment of the Yakima Indian Nation?

D. In preparing and adopting the 1990 Plan Update and EIS, did the County comply with the trial court's previous order and SEPA.

## III
### ANALYSIS

Under the Washington State solid waste management act, RCW 70.95, every county must prepare and adopt a comprehensive solid waste management plan. RCW 70.95.080. The plan must be reviewed and revised periodically to show long range needs for solid waste handling facilities for 20 years into the future, and a revised construction and capital acquisition program for 6 years into the future. RCW 70.95.110(1). Beginning in 1991, the plans must be updated every 5 years. RCW 70.95.110(2).

RCW 70.95 requires a comprehensive solid waste management plan to be in place and approved by the Department of Ecology (DOE) before a county may receive a permit for building or altering a solid waste disposal facility. RCW 70.95.170. Under SEPA, such a broad plan is called a "nonproject" action. "Nonproject" means actions such as plans,

policies, or programs which are different or broader than a single site-specific project. WAC 197-11-774. In this case, Klickitat County needed to have in place a nonproject solid waste plan, approved by DOE, before it could receive a permit to proceed with a "site-specific" project such as building, operating, or enlarging the Roosevelt Landfill.

Once the trial court invalidated the 1989 Plan Update for lack of an EIS, the County no longer had a broad, nonproject solid waste management plan in place, authorizing it to proceed with site-specific development of a landfill. Therefore, before the County could proceed, it had to produce a new nonproject plan, the 1990 Plan Update. The purpose of the 1990 Plan Update would be to analyze the County's options for solid waste management, including both the regional landfill and alternatives such as a small municipal landfill or exporting solid waste to another county or state. In other words, in drafting the 1990 Plan Update and EIS, the County had to revisit the question of whether it wanted a regional landfill, or whether one of the other alternatives would be better in light of the environmental impact of the different options. The issues in this case turn on whether the 1990 Plan Update and EIS adequately did that job under SEPA's requirements.

## A

The first issue raised is whether this appeal should be dismissed as moot. After briefing was completed, Klickitat County and Rabanco (Respondents) brought a joint motion to dismiss the appeal under RAP 18.9(c)(2). Respondents argue the appeal is moot because the 1990 Plan Update and EIS have been superseded by the County's adoption of a 1992 addendum to the 1990 Plan Update, along with a supplemental EIS.

According to Respondents, since the adoption of the 1990 Plan Update, new federal and state regulations have been adopted affecting the County's handling of solid waste. Under the 1990 Plan Update, the landfill is authorized to take up to

1 million tons of municipal waste and 2 million tons of CDL/ woodwaste under less stringent environmental controls. Rabanco proposed combining the two types of waste into a single annual limit of 3 million tons, with the application of the new more stringent standards to all of the waste. In order to address these changes, the County adopted a 1992 addendum to the 1990 Plan Update. Resolution 15392. The County also prepared a supplemental EIS for the 1992 Plan Update addendum, and a final supplemental EIS for the Roosevelt Regional Landfill Modification and Expansion. Respondents argue the 1992 addendum and EIS make the 1990 Plan Update moot.

The Yakima Indian Nation argues the case is not moot because all of the issues pertain to the validity of the *initial* planning process. The tribe does not challenge the 1992 addendum and decision to expand the Roosevelt Landfill. Rather, it challenges the adequacy of the initial procedure under SEPA for evaluating whether a large regional landfill should be constructed within Klickitat County and the impact of that development. If the original procedure leading to the initial landfill construction is flawed under SEPA, the 1992 addendum does not correct that flaw because it does not address the same initial decision or the same environmental impact concerns as the 1990 Plan Update. We agree.

■ An appeal is moot where it presents purely academic issues and where it is not possible for the court to provide effective relief. *See, e.g., In re Cross*, 99 Wn.2d 373, 376-77, 662 P.2d 828 (1983). When an appeal is moot, it should be dismissed. *Sorenson v. Bellingham*, 80 Wn.2d 547, 558, 496 P.2d 512 (1972).

The issues in this case are not moot. The 1992 addendum is not a completely new update or plan standing alone. Rather it is an addendum to the 1990 Plan Update, standing on its shoulders, so to speak. The addendum merely changes one aspect of the 1990 Plan Update; it is not a substitute for the entire Plan.

"Addendum" means an environmental document used to provide additional information or analysis that *does not substantially change the analysis of significant impacts and alternatives in the existing environmental document.*

(Italics ours.) WAC 197-11-706. If the 1990 Plan Update is void for failure to follow the strictures of SEPA, then the underpinnings of the 1992 addendum are gone. The issue in this case is whether the analysis of significant impacts and alternatives in the existing environmental document — the 1990 Plan Update and EIS — is adequate under SEPA. If the decision to build a regional landfill was not based on an adequate EIS, then the County must revisit that planning process and address the question of whether to have a regional landfill at all. The 1992 addendum also does not purport to correct any of the alleged errors in the 1990 Plan Update and, in particular, does not address the countywide impact of a regional landfill on the cultural and historic environment of the Yakima Indian Nation.

Even if the issue were moot, this court has the discretion to retain and decide an appeal which has otherwise become moot if it involves a question of continuing and substantial public interest. *Sorenson*, 80 Wn.2d at 558. Criteria to be considered are: (1) whether the issue is of a public or private nature; (2) whether an authoritative determination is desirable for future guidance; (3) whether the issue is likely to recur, *Sorenson*, 80 Wn.2d at 558; and (4) whether there is genuine adverseness and quality advocacy on the issues. *Hart v. Department of Social & Health Servs.*, 111 Wn.2d 445, 448, 759 P.2d 1206 (1988).

All of these criteria are met in this case. Therefore, even if the issue were moot, we find it proper for us to decide.

## B

▉ We turn now to the substantive issues in this case, which address the adequacy of the EIS prepared for the 1990 Plan Update. Whether an EIS is adequate is a question of law, subject to review de novo. *Solid Waste Alternative Proponents v. Okanogan Cy.*, 66 Wn. App. 439, 441, 832 P.2d 503,

*review denied*, 120 Wn.2d 1012 (1992); *Citizens for Clean Air v. Spokane*, 114 Wn.2d 20, 34, 785 P.2d 447 (1990). The appellate court reviews the county's decision regarding EIS adequacy, not the decision of the trial court. *Maranatha Mining, Inc. v. Pierce Cy.*, 59 Wn. App. 795, 799 n.5, 801 P.2d 985 (1990). Although review is de novo, the court must give "substantial weight" to the governmental agency's determination that an EIS is adequate under SEPA. RCW 43.21C.090; *Citizens for Clean Air*, 114 Wn.2d at 34.

■■ EIS adequacy refers to the legal sufficiency of the environmental data contained in the impact statement. R. Settle, *The Washington State Environmental Policy Act: A Legal and Policy Analysis* § 14(a)(i) (4th ed. 1993). The adequacy of an EIS is tested under the "rule of reason". *SEAPC v. Cammack II Orchards*, 49 Wn. App. 609, 614-15, 744 P.2d 1101 (1987); *Cheney v. Mountlake Terrace*, 87 Wn.2d 338, 344-45, 552 P.2d 184 (1976). In order for an EIS to be adequate under this rule, the EIS must present decisionmakers with a "reasonably thorough discussion of the significant aspects of the probable environmental consequences" of the agency's decision. *Cheney*, 87 Wn.2d at 344-45 (quoting *Trout Unlimited v. Morton*, 509 F.2d 1276, 1283 (9th Cir. 1974)). The rule of reason is "in large part a broad, flexible cost-effectiveness standard", in which the adequacy of an EIS is best determined "on a case-by-case basis guided by all of the policy and factual considerations reasonably related to SEPA's terse directives". R. Settle § 14(a)(i), at 156, 155.

The first issue is whether the trial court erred in holding the 1990 Plan Update and EIS appropriately incorporated by reference the draft supplemental EIS prepared for Rabanco's CDL/woodwaste proposal. The Yakima Indian Nation argues the CDL/waste DSEIS should not have been incorporated by reference into the 1990 Plan Update because it was not an "existing" environmental document at the time of original incorporation, it was later withdrawn from circulation, and it was a site-specific document incorporated into a nonproject plan document. We shall address each of these contentions in turn.

The tribe first argues the CDL/woodwaste DSEIS should not have been incorporated by reference into the 1990 Plan Update and EIS. It notes the 1990 draft EIS was issued on August 31, 1990, whereas the CDL/woodwaste DSEIS was not issued until September 4, 1990. As such, the CDL/woodwaste DSEIS was not an "existing environmental document" and could not be incorporated under SEPA.

Respondents argue the document was an existing document by the time of the 1990 final EIS and was available for public review and comment. Respondents also contend SEPA encourages incorporation by reference and early disclosure of environmental data. We agree.

WAC 197-11-600(2) provides:

> An agency may use *environmental documents* that have *previously been prepared* in order to evaluate proposed actions, alternatives, or environmental impacts. The proposals may be the same as, or different than, those analyzed in the existing documents.

(Italics ours.) "Environmental document" means "any *written public document* prepared under [SEPA]". (Italics ours.) WAC 197-11-744. Existing environmental documents may be incorporated by reference. WAC 197-11-600(4)(b). Incorporation by reference means the inclusion of all or part of any existing document in an agency's environmental documentation by reference. WAC 197-11-754. WAC 197-11-635 sets out the procedure for incorporation by reference:

> (1) Agencies *should use existing studies* and *incorporate material by reference whenever appropriate.*
> (2) Material incorporated by reference (a) shall be cited, its location identified, and its relevant content briefly described; and (b) shall be made available for public review during applicable comment periods.

(Italics ours.)

Under these regulations, the CDL/woodwaste DSEIS may not have been a *public* document when it was incorporated into the draft EIS, but it became public when it was issued 5 days later. The County was certainly aware the document was being prepared and would be published shortly. Once pub-

lished, the document was made available for public review during the comment period as required by WAC 197-11-635.

■ SEPA encourages incorporation by reference. *See* WAC 197-11-635. Given that one of the fundamental goals of SEPA is to ensure environmental values are disclosed and considered in agency decisionmaking, *see* RCW 43.21C.030(2)(a)-(c); *Eastlake Comm'ty Coun. v. Roanoke Assocs., Inc.*, 82 Wn.2d 475, 490, 513 P.2d 36, 76 A.L.R.3d 360 (1973), early disclosure by incorporating relevant documents assists in accomplishing this goal.

Finally, we note SEPA prohibits appeals of draft environmental documents. *See* WAC 197-11-680(3)(a)(ii) (appeal of draft EIS adequacy not allowed). Only the County's final EIS is at issue here, and by the date it was issued, the CDL/woodwaste DSEIS was an existing previously prepared environmental document.

The Yakima Indian Nation next argues even if the CDL/woodwaste DSEIS did become an existing environmental document, the County failed to properly respond to written comments on the CDL/woodwaste DSEIS, and as a result, it was not subject to the same SEPA review process as the rest of the 1990 Plan Update.

Some background information is helpful on this issue. In responding to the draft 1990 Plan Update and EIS, the Yakima Indian Nation prepared and filed extensive comments on the incorporated CDL/woodwaste DSEIS. It also requested the document be withdrawn on the grounds it was inappropriate for the County to plan a new site-specific facility prior to having in place an approved, environmentally acceptable solid waste management plan. The County partially agreed by announcing it would not issue the final supplemental EIS on the CDL site-specific proposal until after the 1990 Plan Update and final EIS were issued. However, the County continued to incorporate the CDL/woodwaste DSEIS into the 1990 Plan Update EIS. Because finalization of the CDL proposal was being delayed, the County did not respond to all of the tribe's written comments about the site-

specific CDL proposal. The County advised that it would respond to those comments in the CDL/woodwaste final supplemental EIS rather than in the 1990 Plan Update EIS.

The Yakima Indian Nation contends this left it in a legal "catch 22" situation. The tribe argues the County's refusal to respond to written comments on the CDL/woodwaste DSEIS violated SEPA's provisions requiring that incorporated documents must be subject to the same review process as the document in which they are incorporated into. The County argues it withdrew the CDL/woodwaste DSEIS from continued review until after issuing the 1990 Plan Update at the request of the Yakima Indian Nation; thus, any legal "catch 22" was of its own making. According to the County, it continued to incorporate the CDL/woodwaste DSEIS to provide additional information for the 1990 Plan Update as allowed by SEPA. Because the County had been criticized earlier by the trial court for not producing all of the environmental data at its disposal in the 1989 Plan Update, the County decided to err on the side of more, rather than less, disclosure. Finally, the County argues it did respond to some of the tribe's written comments and that SEPA does not require comment by comment response; other responses were made by supplementing or modifying the final EIS.

WAC 197-11-500 provides the public must be given the opportunity for consultation and comment on environmental documents, and lead agencies must respond to those comments in preparing the final EIS:

> Review, comment, and responsiveness to comments on a draft EIS are the focal point of the act's commenting process because the DEIS is developed as a result of scoping and serves as the basis for the final statement.

WAC 197-11-500(4). Under WAC 197-11-560(1), the lead agency preparing the final EIS "*shall consider* comments" received on its proposal and "*shall respond*" by one or more of several methods, including: direct responses, modifications, new alternatives, supplementation, or factual corrections. The agency may also explain why the comments do not war-

rant further agency response, citing sources, authorities, or reasons in support. WAC 197-11-560(1)(e). The lead agency may respond to each comment individually, respond as a group, cross-reference comments and corresponding changes in the EIS, or use other reasonable means to indicate an appropriate response to comments. WAC 197-11-560(3). Comments and responses are to be published in the final EIS. WAC 197-11-560(2).

■ Although the County employed all of these methods for responding, the County concedes that responses were *not* made to all of the comments. Responses to comments on the CDL/woodwaste DSEIS were held back and would not be provided until the final CDL/woodwaste SEIS was issued. That decision not to respond was in error.

Once the CDL/woodwaste DSEIS was incorporated into the 1990 Plan Update draft EIS, it became part of that document subject to the same SEPA review and comment process:

> When an agency decides to use all or part of an existing SEPA document as part of a[n] . . . EIS, the agency *incorporates* by reference all or part of the existing document *into the . . . EIS it is preparing . . ..*
> . . . [M]aterial incorporated by reference *becomes part of a new DEIS . . . subject to independent review, circulation and other process requirements.*

(Italics ours.) R. Settle § 15, at 211. These process requirements include the comment procedures required under WAC 197-11-500 *et seq. See* R. Settle § 15, at 211 n.24. A later response while reviewing the site-specific CDL proposal would not address potential inadequacies of the incorporated document to the extent it was being used to substantiate environmental impacts in the 1990 Plan Update and EIS. By not responding to written comments on an incorporated document, the County made that part of the 1990 Update and EIS not subject to the review process requirements of SEPA.

■ Procedural errors occurring during the EIS process are reviewed under the rule of reason. Where such errors are not

consequential, they must be dismissed as harmless. *See Mentor v. Kitsap Cy.*, 22 Wn. App. 285, 290-91, 588 P.2d 1226 (1978). Although the County failed to respond to specific comments on the CDL/woodwaste DSEIS, it did respond to other general comments on handling CDL waste, and made some modifications and additions to the final EIS as a result. Under the rule of reason, we conclude the County's failure to respond to comments on the CDL/woodwaste DSEIS does not render the 1990 Plan Update EIS inadequate.

Lastly, the tribe argues the County violated SEPA by proceeding with the site-specific CDL/woodwaste DSEIS at the same time it was developing the 1990 Plan Update EIS. Under RCW 70.95.170, .180, and .185, the County must have in place an approved solid waste management plan before it can obtain permits for building or expanding the capacity of a landfill. The tribe argues the County put the cart before the horse. By incorporating the CDL/woodwaste DSEIS into the 1990 Plan Update EIS, the tribe contends, the County obtained approval of a site-specific proposal in a broad nonproject proposal, making the building of the CDL/woodwaste facility a foregone conclusion.

Respondents contend SEPA encourages the incorporation of existing environmental documents, including *draft* EIS's, early disclosure of environmental information, and concurrent development of projects. We agree.

Incorporation by reference of a site-specific proposal into a broad nonproject proposal is not specifically addressed by SEPA. SEPA does allow for "phased review". WAC 197-11-060(5)(b). Phased review means "the coverage of general matters in broader environmental documents, with subsequent narrower documents concentrating solely on the issues specific to the later analysis". (Citation omitted.) WAC 197-11-776. Phased review assists agencies and the public to focus on issues ready for decision and exclude from consideration issues already decided or not yet ready. WAC 197-11-060(5)(b). Phased review is only appropriate when going from a broad policy analysis to a more specific one:

(c) Phased review *is appropriate* when:
(i) The *sequence is from a nonproject document to a document of narrower scope* such as a *site specific analysis*;

. . . .

(d) Phased review is *not* appropriate when:
(i) *The sequence is from a narrow project document to a broad policy document*; . . ..

(Citation omitted. Italics ours.) WAC 197-11-060(5)(c)(i), (d)(i).

The 1990 Plan Update acknowledges it is part of a phased review. *See* WAC 197-11-060(5)(e) (must disclose using phased review). The Plan incorporates by reference the final EIS for the site-specific project to build the Roosevelt Landfill and also incorporates the draft supplemental EIS for building the CDL/woodwaste facility at the Landfill. By incorporating both of these site-specific documents into its broad, nonproject proposal, arguably the County appears to be conducting its phased review by going from the narrow to the broad project document.

 Such is not the case, however. The development and implementation of a site-specific CDL/woodwaste facility is not a foregone conclusion based on the Board's approval of the 1990 Plan Update and EIS. Development of that facility would be dependent on additional environmental review of the site-specific proposal, which was delayed until after the 1990 Plan Update was adopted. In fact, the County acknowledged as much in the 1990 Plan Update:

> Issuance of an environmental review document for the CDL/woodwaste landfill *in no way endorses or approves that proposal*. Timely issuance of environmental review is required by SEPA and is appropriate given past criticisms of the County's solid waste planning process for not providing prompt and full information regarding proposals that are to be considered. In accordance with the comment, *no facility permits for any CDL/woodwaste proposal will be considered until after the Board of County Commissioners acts on the 1990 Plan Update.*

(Italics ours.) 1990 Plan Update vol. 2 pt. 4 (Responses to Comment, letter dated Sept. 19, 1990, from Cockrill, Weaver, and Bjur, P.S., for the Yakima Indian Nation, at 6).

Other provisions of SEPA favor the County's incorporation of the site-specific CDL/woodwaste EIS into the 1990 Plan

Update EIS. WAC 197-11-442(3) provides if a nonproject proposal concerns a specific geographic area, site-specific analyses may be included for the areas of specific concern even though they are not required. As noted above, SEPA encourages the incorporation by reference of existing documents to avoid unnecessary duplication and reduction of paperwork. *See* WAC 197-11-640; WAC 197-11-060(5)(f). Incorporation includes any existing environmental document, including EIS's, and the definition of an EIS includes *drafts* and *supplemental* EIS's. WAC 197-11-600(4)(b); WAC 197-11-738. An agency does not have to wait until an environmental document is final to incorporate it.

SEPA also encourages early dissemination of environmental information. WAC 197-11-055(2) (stating environmental information should be released at the earliest possible point). More importantly, SEPA acknowledges proposals do not have to be prepared on a linear time scale. SEPA requirements may be integrated with existing agency planning so procedures can run concurrently rather than consecutively. WAC 197-11-030(2)(e).

Thus, future County approval or environmental review of a site-specific plan does not preclude consideration of that proposal during the earlier, nonproject solid waste plan where that future activity is specific enough to allow some evaluation of its probable environmental impacts. *See* WAC 197-11-055(2)(a)(i). Such early disclosure best serves the purposes of SEPA:

> The procedural duties imposed by SEPA — full consideration to environmental protection — are to be exercised to the fullest extent possible to insure that the "attempt by the people to shape their future environment by deliberation, not default" will be realized.

*Eastlake Community Council*, 82 Wn.2d at 490 (quoting *Stempel v. Department of Water Resources*, 82 Wn.2d 109, 118, 508 P.2d 166 (1973)).

We hold the 1990 Plan Update and EIS appropriately incorporated by reference the draft supplemental EIS prepared for Rabanco's CDL/woodwaste proposal.

## C

The next issue is whether the trial court erred in determining the EIS for the 1990 Plan Update complied with SEPA in its treatment of the cultural and natural resource concerns of the Yakima Indian Nation.

The tribe argues the EIS failed to adequately analyze the impact of building a regional landfill on the cultural and historic resources of the Yakima Indian Nation.[4] In response, the County and Rabanco argue SEPA gives the lead agency more flexibility in determining the amount of detail covered in a nonproject EIS. They contend a nonproject EIS like the 1990 Plan Update does not require great detail and they provided an appropriate level of analysis which adequately disclosed the concerns of the Yakima Indian Nation. We do not entirely agree.

■ SEPA calls for a level of detail commensurate with the importance of the environmental impacts and the plausibility of alternatives. *See* R. Settle § 14(a)(i), at 158; *Solid Waste Alternative Proponents*, 66 Wn. App. at 442-46; WAC 197-11-402(2), -440(5)(b)(i), -440(5)(c)(iv), -440(6)(b)(i).

> [A]n EIS is not a compendium of every conceivable effect or alternative to a proposed project, but is simply an aid to the decision making process. That is, the EIS need include only information sufficiently beneficial to the decision making process to justify the cost of its inclusion. Impacts or alternatives which have insufficient causal relationship, likelihood, or reliability to influence decisionmakers are "remote" or "speculative" and may be excluded from an EIS.

(Footnote omitted.) R. Settle § 14(a)(i), at 157. "The lead agency shall discuss impacts and alternatives in the level of

---

[4]The Yakima Indian Nation also argues the County failed to respond to or rebut the extensive comments by Dr. Morris Uebelacker, the tribe's expert on the Yakima Indian Nation and its culture. We do not find this argument persuasive. Under SEPA, the lead agency may respond to comments individually or as a group. WAC 197-11-560(3). The County responded to the comments from Dr. Uebelacker along with comments from the Yakima Indian Nation, and Dr. Uebelacker's letter, the County's responses, and Dr. Uebelacker's affidavit were published in the final 1990 Plan Update and EIS. See 1990 Plan Update and EIS vol. 2 pt. 4 (Responses to Comments from Morris Uebelacker (in support of comments from Yakima Indian Nation)).

detail appropriate to the scope of the nonproject proposal and to the level of planning for the proposal". WAC 197-11-442(2). *See Cathcart-Maltby-Clearview Comm'ty Coun. v. Snohomish Cy.*, 96 Wn.2d 201, 211, 634 P.2d 853 (1981) (holding EIS was adequate because it identified "the potential impacts and [provided] a framework for further EIS preparation").

Even at this more generalized level, however, "[s]ignificant impacts on both the natural environment and the built environment *must* be analyzed, if relevant", in an environmental impact statement. (Italics ours.) WAC 197-11-440(6)(e). One element of the built environment is "*historic and cultural preservation*". (Italics ours.) WAC 197-11-444(2)(b)(vi).

Under these rules, the 1990 Plan Update EIS should identify and discuss any elements of the natural and built environment, including historic and cultural preservation, in which there is a probable significant, adverse impact under the nonproject solid waste management plan. Given that it is a nonproject plan, it need only analyze environmental impacts at a highly generalized level of detail. However, we think the 1990 Plan Update EIS fails to meet even this minimum standard.

The 1990 Plan Update EIS addresses cultural and historical resources in a cursory superficial manner. The only discussion of this impact is limited to a one-half-page discussion in chapter 3 and another one-fourth-page discussion in chapter 12. 1990 Plan Update vol. 1, at 3-7, 12-4. For example, the EIS states in part:

> Native American sites and artifacts occur throughout Klickitat County. Construction of any of the facilities considered in the solid waste management alternatives could result in disruption or loss of historic or cultural artifacts or structures. *It is not possible to meaningfully evaluate all such environmental impacts in a programmatic EIS. Such detailed review is appropriate in site-specific proposals taken to implement any portion of this 1990 Plan Update.*

(Italics ours.) 1990 Plan Update vol. 1, at 12-4.

Respondents are correct that a lead agency has a certain amount of flexibility in determining the level of detail appropriate for a nonproject EIS, in part because there is usually less detailed information available on its environmental impacts and on any subsequent project proposals. WAC 197-11-442(1). However, this EIS addresses the cultural and historical impacts in only two locations, for a total of approximately 1 page of text, in a document hundreds of pages long. This is simply inadequate. Certainly the building of a regional landfill accepting 3 million tons of waste per year will have an impact on the residents of the County, including the Yakima Indian Nation, and impact their use of the County as a cultural and historical resource.

The lack of information is particularly apparent in light of the detailed discussion of the Plan's potential impact on other elements of the natural and built environment. For example, the EIS notes the Roosevelt Landfill will affect County transportation by generating up to 660 truck trips per day, 21 to 25 train trips per week (one way), and 14 to 42 barge trips per week. 1990 Plan Update vol. 1, at 12-24. Yet the considerable impact of this increase in transportation on the cultural and historical environment of the County is not analyzed.

The EIS attempts to dodge the issue by stating these impacts can be meaningfully evaluated only in site-specific proposals. We disagree. One of the primary purposes of the 1990 Plan Update is to make an initial evaluation of whether the County wants to build a large regional landfill at all, or whether one of the proposed alternatives would be a better course of action. Postponing discussion of historical and cultural impacts to a later site-specific proposal would prevent the Board from considering these impacts in its evaluation. Although a discussion of historical and cultural impacts need not be at the level of detail needed in a site-specific proposal, we do not think a 1-page discussion is sufficient to adequately inform the Board's decision.

Fortunately for Respondents, the 1990 Plan Update and EIS does incorporate by reference a document prepared by Larson Anthropological/Archaeological Services for the Roosevelt Landfill CDL proposal, entitled "Cultural Resource Assessment of Proposed CDL/Woodwaste Landfill, Klickitat County" (Larson Study). CDL/woodwaste DSEIS app. A. The Larson Study addresses the cultural impact of building and expanding the proposed CDL/woodwaste facility at the Roosevelt Landfill. Although the Larson study is site-specific, it goes on to include details about local tribes, historic Euro-American land use, previous archaeological studies, ethnography, ethnohistory, and traditional cultural use of local resources in Klickitat County. As such, this general discussion of cultural impacts would apply beyond the site-specific area.

In determining whether a particular discussion of environmental factors in an EIS is adequate under the rule of reason, the reviewing court must determine whether the environmental effects of the proposed action are sufficiently disclosed, discussed, and substantiated by supportive opinion and data. *Leschi Imp. Coun. v. State Hwy. Comm'n*, 84 Wn.2d 271, 286, 525 P.2d 774, 804 P.2d 1 (1974). Under the rule of reason, the Larson Study provides a reasonably thorough discussion of the significant aspects of the probable environmental consequences of the Board's decision to adopt the 1990 Plan Update and its recommended course of action of building and enlarging a regional landfill. Given that the Larson Study was incorporated into the 1990 Plan Update and EIS, it substitutes for an otherwise inadequate level of analysis.[5]

We therefore hold the EIS for the 1990 Plan Update was adequate as a matter of law under SEPA in its discussion of

---

[5]In concluding the Larson Study satisfies the requirements of SEPA for analyzing the cultural and historical impact of the 1990 Plan Update and EIS, we do not mean to imply the level of detail necessary for a site-specific EIS such as the Larson Study is also necessary for a nonproject plan. We simply conclude on these facts, given the inadequacy of the discussion in the 1990 EIS document, the incorporated site-specific study provides sufficient detail to render the EIS adequate.

the impact of developing a large regional landfill on the cultural and historical environment of the Yakima Indian Nation in Klickitat County.

## D

The last issue is whether the County complied with SEPA and the terms of the trial court's order invalidating the 1989 Plan Update or whether the County's preparation and adoption of the 1990 Plan Update and EIS was adequate under the rule of reason.

Under its order, the court instructed the County to make a new threshold decision about whether a large regional landfill should be constructed and operated within the county. The court stated:

The process of adopting said final EIS and [the 1990 Plan] Update to the Solid Waste Management Plan shall be conducted in a manner that *the decision is clearly a new threshold decision on the acceptance of regional waste,* taking into consideration that the previous contractual relationship between the Defendants creates no obligation to continue with the previous decision.

(Italics ours.) 1990 Plan Update vol. 1 app. F.

■ This issue turns on whether the Board failed to make a new threshold decision in adopting the 1990 Plan Update and EIS. Judicial review under SEPA is of the governmental action together with its accompanying environmental determinations. RCW 43.21C.075(6)(c). "[t]he whole range of process requirements for EIS preparation and use are potential grounds for legal challenge". R. Settle, *The Washington State Environmental Policy Act: A Legal and Policy Analysis* § 14(a), at 149 (1990). These challenges are evaluated under the rule of reason. R. Settle, at 154.

The Yakima Indian Nation argues the County failed to comply with this order and SEPA in preparing the 1990 Plan Update and EIS. According to the tribe, the County performed the EIS on a fast track and, in effect, only paid "lip service" to the requirements of SEPA. It challenges the fact the County started the EIS on August 1, 1990, before the trial court issued its order in September 1990. The tribe notes the

"Determination of Significance", which officially launched the EIS, listed Rabanco as a proponent even though the trial court ordered the County to make a new independent decision, free from influence of the Rabanco contract. According to the tribe, the inclusion of Rabanco in the process reflects a failure to comply with the court's order and taints the entire 1990 Plan Update and EIS.

Respondents argue they complied with all applicable SEPA timing requirements, and even repeatedly extended SEPA time periods for comments in order to accommodate requests from the Yakima Indian Nation and other parties. Respondents contend they were obviously made aware of the need to conduct an EIS when the trial court issued its memorandum on July 13, 1990, setting aside the 1990 Plan Update for lack of an EIS. Respondents argue delaying the EIS would have been inconsistent with SEPA, which encourages beginning environmental review at the earliest possible time. We find Respondents' arguments persuasive.

Nothing in the rules requires the County to wait until after the trial court issues its final order to begin the EIS. On the contrary, SEPA encourages starting environmental review at the earliest possible time to ensure planning decisions reflect environmental values. *See* WAC 197-11-055; WAC 197-11-406. Given the County's 1990 Plan Update was already under way, it was appropriate to start the EIS once ordered by the court.

The Yakima Indian Nation is correct that Rabanco was listed as a proponent on the Determination of Significance, the official document which initiates the EIS process. See ROW vol. 3A table 3. However, once the County decided that the site-specific CDL/woodwaste facility would be dealt with separately from the 1990 nonproject plan, Rabanco was deleted as a proponent. Rabanco is not listed as a proponent in either the draft 1990 Plan Update and EIS issued on August 31, 1990, or the final Plan Update and EIS produced in November 1990.

The Yakima Indian Nation argues releasing an EIS so soon after completion of scoping gives the appearance the EIS issues and range of alternatives have been predetermined. It notes the EIS for the 1990 Plan Update was drafted in less than 1 month and was issued less than 2 weeks after the last public scoping hearing. It argues because the 1990 Plan Update and EIS were prepared so quickly, adoption of the Plan could not represent a new threshold decision of whether to build a regional landfill, as ordered by the trial court. We disagree.

SEPA does not set a minimum time limit for preparing a draft EIS. Although there are time limits for scoping and comment periods, the County has complied with these, and the tribe does not argue otherwise. The County conducted scoping hearings calling for comments, and the 1990 Plan Update was sent to over 200 interested persons, organizations, and agencies to solicit additional comments. The comment period on the draft was extended from the original deadline at the request of the tribe. In addition, Respondents had already gathered a great deal of information in preparing the 1989 and 1990 Plan Updates and site-specific proposals, and it is logical the County could draw on this information to assemble a draft EIS more quickly than under different circumstances. The County was also under statutory time pressures. Once the 1989 Plan Update was voided, the County was then operating under the 1977 Plan Update, and a new update was 8 years overdue. See ROW vol. 3B table 94 (last approved plan was adopted in 1977, and in 1986, update was 4 years overdue). Understandably, the County wanted to move quickly to bring its solid waste management plan into conformance with statutory requirements.

Finally, we note the trial court was satisfied the EIS was adequate and the decision by the Board to adopt the 1990 Plan Update was a new, fresh, independent determination of

whether to build a regional landfill of the magnitude proposed in Klickitat County. Memorandum of opinion (June 6, 1991); Clerk's Papers, at 36-38. The court stated:

> The key developmental agencies have had the opportunity and depth to review the site, the plan, and the proposed mitigation to ensure public health and safety; and their careful consideration does not appear to be clearly erroneous. After having read and examined the numerous volumes in dealing with the issues, the decisions that the duly elected officials have made cannot be found to be clearly erroneous or not supported by substantial evidence contained in the record.

Clerk's Papers, at 37. We find the trial court's conclusion particularly persuasive in light of the fact the court's decision upholding the 1990 Plan Update and EIS was by the *same judge* who invalidated the 1989 Plan Update.

IV

We hold Klickitat County complied with SEPA's procedural requirements and with the Skamania County Superior Court's order dated September 14, 1990, and further hold the County's adoption of the 1990 Plan Update and EIS is deemed adequate under the rule of reason.

The Skamania County Superior Court is affirmed.

ANDERSEN, C.J., and UTTER, BRACHTENBACH, DOLLIVER, DURHAM, SMITH, GUY, and MADSEN, JJ., concur.

After modification, further reconsideration denied January 28, 1994.